UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

HOME FEDERAL BANK OF TENNESSEE,    )
                                   )
                  Plaintiff,       )
                                   )
v.                                 )        No. 3:18-CV-379-JRG-DCP
                                   )
HOME FEDERAL BANK CORPORATION,     )
                                   )
                  Defendant.       )

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order [Doc. 109] of referral by the District Judge.

Now before the Court are the following Motions: (1) Defendant's Emergency Renewed Motion to Amend Agreed Protective Order [Doc. 96]; (2) Defendant's Motion to Disqualify [Doc. 115]; Defendant's Motion for Evidentiary Hearing [Doc. 126]; and (3) Defendant's Motion for Leave to File Supplemental Memorandum [Doc. 178].

The parties appeared before the undersigned for a motion hearing on November 26, 2019. Attorneys Chris Cain, Cheryl Rice, John Wood, and Thomas S. Scott, Jr., appeared on behalf of Plaintiff. Attorneys Amy Cubbage, Nicholas Vescovo, M. Edward Owens, Jr., and David Blandford appeared on behalf of Defendant.[1] Accordingly, for the reasons more fully explained below, the Court hereby **RECOMMENDS** that Defendant's Motions be **DENIED** [**Docs. 96, 115, 126, 178**].

---

[1] Attorneys Amy Cubbage and David Blandford withdrew from representing Defendant on February 5, 2020. [Doc. 182].

1

# I. BACKGROUND

The Court will first revisit the pleadings in this case and then turn to the procedural history.[2]

## A. Pleadings

The Complaint [Doc. 1] in this matter was filed on September 11, 2018. The Complaint avers that Plaintiff was founded in Knoxville, Tennessee, in 1936 and is one of the largest locally headquartered banks operating in East Tennessee. [Doc. 1 at ¶ 9]. It currently operates twenty-three (23) full-service branch locations in Tennessee, which are located within the following counties: Knox, Blount, Sevier, and Anderson. [*Id.* at ¶ 10].

The Complaint states that Plaintiff is the owner of the valid and subsisting service mark HOME FEDERAL ("Home Federal Mark"), which is registered in Tennessee. [*Id.* at ¶ 16]. Plaintiff has used the Home Federal Mark in commerce continuously since 1936 to market, advertise, and sell its services. [*Id.* at ¶ 17]. Plaintiff also owns a stylized service mark ("HF Mark"), which is also registered in Tennessee. [*Id.* at ¶ 18]. The Complaint states that Plaintiff has used the HF Mark in commerce continuously since March 17, 1989. [*Id.* at ¶ 20]. Since 1989, Plaintiff has used the Home Federal Mark and the HF Mark (collectively, the "Marks") on its branding activities associated with its services. [*Id.* at ¶ 21].

The Complaint alleges that Plaintiff has expended substantial time, money, and resources marketing, advertising, and promoting its services with the Marks. [*Id.* at ¶ 22]. The Complaint states that as a result of its widespread, continuous, and exclusive use of the Marks to identify Plaintiff's services, Plaintiff owns valid and subsisting federal and Tennessee statutory and common law rights to the Marks. [*Id.* at ¶ 24]. The Complaint further states that the Marks have

---

[2] The Court summarized the pleadings in its Memorandum and Order [Doc. 60].

2

become valuable assets that symbolize the high quality of Plaintiff's service, and have acquired incalculable distinction, reputation, and goodwill belonging exclusively to Plaintiff. [*Id.* at ¶ 27].

The Complaint further alleges that without Plaintiff's authorization and beginning after Plaintiff acquired protectable exclusive rights in the Marks, Defendant adopted and began using marks that are confusingly similar to Plaintiff's Marks. [*Id.* at ¶¶ 30-32]. The Complaint states that Plaintiff's use of the Marks is senior to Defendant's use. [*Id.* at ¶¶ 39-40]. The Complaint further alleges that Defendant's infringing acts have caused and are likely to continue to cause confusion, mistake, and deception among the relevant consuming public as to the source or origin of Defendant's banking and mortgage services. [*Id.* at ¶ 57]. The Complaint avers that Defendant's use of similar marks is likely to continue to deceive the relevant consuming public into mistakenly believing that Defendant's banking and mortgage services originate from, are associated or affiliated with, or otherwise authorized by Plaintiff. [*Id.*]. In addition, the Complaint states that Defendant's infringing acts have resulted in actual confusion. [*Id.* at ¶ 58]. The Complaint states that Defendant's acts are willful and such acts will continue to cause damage and immediate irreparable harm to Plaintiff.

The Complaint alleges violations of section 43(a) of the Lanham Act, Tennessee infringement, common law unfair competition, and violations of the Tennessee Anti-Dilution Statute. [*Id.* at 11-15].

Defendant filed Counterclaims alleging willful trademark infringement and trademark misuse. [Doc. 11 at ¶ 11] (Counterclaims). In addition, Defendant filed a declaratory judgment pursuant to 28 U.S.C. § 2201 to declare that (i) Defendant holds enforceable common law trademark rights in its service marks under federal and Tennessee law; (ii) Defendant does not violate Plaintiff's purported rights under federal and Tennessee law; and (iii) Defendant may

maintain and pursue its current federal trademark applications. Defendant further seeks to cancel or restrict Plaintiff's Tennessee state trademark registrations pursuant to Tennessee Code Annotated § 47-25-509. [*Id.*].

Defendant claims that the parties have coexisted concurrently using the service mark HOME FEDERAL for nearly sixty (60) years and that Plaintiff has been aware of Defendant's use of the mark HOME FEDERAL since Defendant began opening branches in Tennessee twenty-four (24) years ago. [*Id.* at ¶ 5]. Defendant states that it was not until June 13, 2018, that Plaintiff demanded Defendant cease use of HOME FEDERAL. [*Id.* at ¶ 7]. Defendant submits that for the past twenty-four (24) years, it has advertised and marketed its services under the trademark HOME FEDERAL BANK. [*Id.* at ¶ 15]. Further, Defendant states that Plaintiff's domain name registration, www.homefederalbanktn.com, was registered on October 20, 2000 – three (3) years and six (6) months after Defendant registered its website. [*Id.* at ¶ 20]. Defendant asserts that in addition to the trademark rights it holds in HOME FEDERAL, it also holds trademark rights in the name HFB as a result of its consistent use of that name since 1992 in Tennessee and Kentucky. [*Id.* at ¶ 23]. Defendant avers that its design is distinguished from Plaintiff's design. [*Id.* at ¶ 26]. Further, Defendant submits that Plaintiff cannot show a likelihood of confusion based on the distinguishable designs, and the language, "a division of Home Federal Bank Corporation," is a regulatory requirement and is not a use of the name under trademark law. [*Id.* at ¶ 27].

## B.    Procedural History

On March 1, 2019, the parties presented the Court with a proposed Agreed Protective Order [Doc. 26-1]. The Court entered the Agreed Protective Order [Doc. 27] on March 7, 2019. Relevant to the instant dispute, the Protective Order allows the parties to designate certain information as "Confidential Material" and "Highly Confidential Material." [*Id.* at ¶ 1]. Documents marked

4

"Highly Confidential Material" mean that they "contain information protected from disclosure by statute or because the documents contain sensitive personal information, trade secrets, or confidential research, or commercial information, or other information required by law or agreement to be kept confidential, that is an extremely sensitive trade secret or that is otherwise confidential or proprietary." [*Id.* at ¶ 2]. In addition, the "Highly Confidential Material" designation is given to documents that the attorney determines in good faith that disclosure "is likely to cause economic harm or significant competitive disadvantage to the party producing the document." [*Id.* at ¶ 3]. "Highly Confidential Material" may only be disclosed to the attorneys who are assisting in this case and other individuals outlined in the Agreed Protective Order (e.g., experts, potential witnesses, the court). [*Id.* at ¶ 5].[3]

On May 14, 2019, Defendant filed a motion to amend the Agreed Protective Order [Doc. 35]. For grounds, Defendant stated that it learned during discovery that Plaintiff's attorney, Cheryl Rice, is a member of the Plaintiff's Board of Directors ("Board"). Defendant requested that the Court modify the Agreed Protective Order to limit Attorney Rice's review of Highly Confidential Material, arguing that the parties in this case are competitors. In addition, Defendant argued that Attorney Rice's exclusion should also apply to the entire firm of Egerton, McAfee, Armistead & Davis, P.C., pursuant to Tennessee Rule of Conduct 1.10. The Court addressed Defendant's motion at a hearing on June 17, 2019.

The parties' briefs on the above issues cited to the Federal Circuit's decision in *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984), wherein the Court rejected a per se rule

---

[3] Both parties' briefs detail communications and negotiations regarding the Agreed Protective Order. Defendant argues that Plaintiff did not disclose that Attorney Rice was on Plaintiff's Board of Directors, while Plaintiff states that the information was publicly available. The Court notes that this information should have been shared and discussed prior to submitting the Agreed Protective Order to the Court.

5

that disallowed plaintiff's corporate in-house counsel access to confidential information. The Court stated that the focus should be whether in-house counsel is involved in competitive decision making. *Id.* at 1468. Therefore, during the June 17 motion hearing, the Court asked Defendant whether it had any evidence to support its argument that Attorney Rice was engaged in competitive decision making. [Doc. 57 at 123]. Defendant stated that it had requested the deposition of David Sharp, who is a member of Plaintiff's Board. [Id.]. Defendant also pointed to its exhibit, *The Director's Book* from the Office of the Comptroller of the Currency ("OCC"). [*Id.* at 126]. Plaintiff stated that Defendant had asked for Sharp's deposition on June 7, 2019, which was after Defendant filed its motion to amend the Agreed Protective Order. [*Id.* at 129].

Subsequently, on July 2, 2019, the Court entered a Memorandum and Order [Doc. 60], denying Defendant's motion to amend the Agreed Protective Order. The undersigned relied on the decision in *U.S. Steel.* The Court determined that there was no evidence that Attorney Rice was involved in advising or participating in competitive decision making. [Doc. 60 at 17]. The Court further stated that restricting Attorney Rice's access to Defendant's Highly Confidential Material without sufficient facts that show she advises or participates in competitive decision-making runs afoul of the rule announced in *U.S. Steel*. [*Id.*]. The Court also considered Defendant's evidence to rebut Attorney Rice's Declaration (i.e., *The Director's Book* from the OCC), but the Court found that Defendant did not offer any evidence to show that banks, and specifically, Plaintiff, must comply with *The Director's Book*. [*Id.* at 18].

On July 16, 2019, Defendant filed an objection [Doc. 65] to the Court's Memorandum and Order [Doc. 60]. In the objection, Defendant requested, as an alternative, that the issue be remanded to the undersigned for the consideration of additional evidence, including the deposition of Sharp. [Doc. 65 at 18]. Subsequently, on October 24, 2019, Defendant filed its Emergency

6

Renewed Motion to Amend Agreed Protective Order ("Renewed Motion") [Doc. 96]. Defendant stated that it was prompted to file the Renewed Motion because Attorney Rice indicated that she intended to review Defendant's Highly Confidential Material to prepare for depositions.

On October 29, 2019, the District Judge entered an Order [Doc. 109], referring Defendant's Renewed Motion to the undersigned for a Report and Recommendation. The following day, Defendant requested a protective order [Doc. 114], staying discovery pending resolution of the Renewed Motion. The undersigned set a hearing and status conference for November 12, 2019, to address Defendant's request to stay discovery and to generally discuss the parties' discovery efforts and other pending motions. In the interim period of the notice setting the hearing and the November 12 hearing, Defendant filed its Motion to Disqualify Counsel [Doc. 115] and Plaintiff filed a Motion to Compel Discovery [Doc. 116].

On November 12, 2019, the parties appeared before the Court to address Defendant's request to stay discovery. During the November 12 hearing, the Court also set a motion hearing, with the agreement of the parties, for November 26, 2019, to address the Renewed Motion [Doc. 96] and the Motion to Disqualify Counsel [Doc. 115], along with various other motions. *See* [Doc. 122] (minute entry of the hearing). On November 20, 2019, three business days before the motion hearing, Defendant filed a Motion for Evidentiary Hearing [Doc. 126]. As mentioned above, the parties appeared before the undersigned on November 26, 2019, wherein the Court addressed [Docs. 79, 96, 97, 113, 115, and 116] and generally discussed Defendant's Motion for Evidentiary Hearing [Doc. 126].

Subsequently, on November 27, 2019, the Court granted in part [Doc. 135] Defendant's request for a stay of discovery. The Court noted that during the November 12 hearing, the parties agreed that some discovery may able to proceed without Attorney Rice having to review Highly

Confidential Material. The undersigned instructed counsel to work together to determine what discovery may proceed in light of the pending Motions. [Doc. 135].

Finally, on January 14, 2020, Defendant filed a Motion for Leave to File Supplemental Memorandum in Support of Emergency Renewed Motion to Amend Agreed Protective Order and Motion to Disqualify [Doc. 178].

## II.    POSITIONS OF THE PARTIES

The Court will summarize the parties' positions in Defendant's Renewed Motion and Defendant's Motion to Disqualify Counsel.

### A.    Defendant's Renewed Motion [Doc. 96]

Defendant requests that the Agreed Protective Order be amended to restrict Attorney Rice's review of Highly Confidential Material. For grounds, Defendant argues that on July 31, 2019, Plaintiff's former president and current board member, David Sharp ("Sharp"), testified during his deposition that Plaintiff's Board engages in competitive decision making. In addition, Defendant argues that in Plaintiff's responses to Defendant's First Set of Requests for Admission, Plaintiff admitted that the Board has approved the opening of new branches. Defendant further states that Plaintiff responded that it "can neither admit nor deny whether the Home Federal Bank of Tennessee's Board of Directors will approve the opening of new bank branches in the future." [Doc. 96 at 3].

Defendant contends that the legally binding fiduciary duties Attorney Rice owes Plaintiff is in direct conflict with allowing her access to Defendant's Highly Confidential Material. Defendant states that Attorney Rice's fiduciary duties make her a per se decision maker with ultimate fiduciary and legal responsibility for competitive issues such as marketing and marketing strategy. Defendant states that other courts have encountered similar factual scenarios and each

time reached the same conclusion that outside counsel who serves as a member on the board of directors of a company is inherently involved in the competitive decision making of the company. Defendant states that the inherent conflict between the two roles and the chance of inadvertent disclosure is too great to allow Attorney Rice's access to Defendant's Highly Confidential Material.

Defendant states assuming that a board member is not a competitive decision maker as a matter of law, the facts presented establish that Attorney Rice should be restricted from viewing Defendant's Highly Confidential Material. Defendant argues that case law supports its position. Finally, Defendant argues to the extent that there is any prejudice, it is Plaintiff's own making.

As mentioned above, Defendant relies on, in part, the deposition of Sharp. Sharp is Plaintiff's former president, and he currently serves on Plaintiff's Board. [Doc. 96-1 at 4]. During his deposition, Sharp testified that as a member of the Board, he attends monthly board meetings. [*Id.* at 4]. He testified that the Board does not make decisions on behalf of the company and that management makes such decisions. [*Id.*]. He explained that the Board allows management to run the bank. [*Id.*]. Sharp was asked whether the Board approved the opening of new branches, to which he testified as follows: "We haven't had a new branch in a long time. I'm certain management would tell the board that they are –their desires to build a branch in a certain area. We bought property. So if there was any objections, they would certainly bring it. They would so state." [*Id.*]. When asked whether the Board had ever approved of opening a new branch, Sharp testified as follows:

> I can't recall whether that's anything in the minutes of the board—
> whether or not—but I'm certain they had knowledge of our opening
> branches. Our bank—the management of our bank runs our—
> manages our bank, and I'm certain they would bring to the attention
> the board of directors their desire to open a new branch, and if the
> directors had any opposition or any comments, they would so state.

9

> Now, whether or not officially on the record in the minutes, I don't
> call.

[*Id*.].[4]  He continued that it could be that the Board does approve the opening of new branches.

[*Id*.].

Further, Sharp testified that the Board does not participate in setting rates.  [*Id*.].  He further

testified that the Board does not make strategic decisions on behalf of the bank, but management

does so.  [*Id.* at 5].  He was not sure whether the Board approved the filing of the lawsuit.  [*Id*.].

He stated that over the past two years, he may have missed one or two Board meetings.  [*Id*.].  He

testified that the Board performs the following:

> I look at our function as we review the financial statement
> thoroughly.  It's probably about a 25- or 30-page financial
> statement.  And plus review any agenda which is decided by
> management and that we adhere to the policies that we're required
> to review and approve that are regulatory in nature . . .

[*Id.* at 5].  He explained that the Board also has committees, such as the legal audit committee, the

compensation committee, and the trust committee.  [*Id*.].  Sharp testified that the Board votes on

the financial statement, the security report, and the legal audit report.  [*Id*.].  He stated that the

Board also votes on the corporate plan, which he explained as follows:

> [I]t's based on objectives to make a certain amount of money.  You
> are going to estimate the return on your bond portfolio.  You're
> going to estimate your costs of liabilities on your deposits.  You're
> gonna estimate the income from your trust department.  And you're
> going to estimate the expenses, operating expenses, such as
> employees, pension benefits, insurance expenses.

[*Id*.].

Sharp further testified, "If we are going to plan for a branch –if management had plans for

a branch, it would be itemized in the corporate plan.  It would be listed that we're considering

---

[4] Plaintiff raised a continuing objection based on relevancy, but the Court finds that the above line of questioning is relevant to the issues presented in the filings.

opening a branch at a certain location."  [*Id.* at 5].  The Board would approve and vote on such a plan.  [*Id.* at 5-6].  Sharp testified that the Board had to approve Plaintiff's branches in Sevier County, Blount County, and in Anderson County.  [*Id.*].  Sharp testified that the Board does not engage in competitive decision making.  [*Id.* at 6].

Defendant also submitted Plaintiff's Responses to the Requests for Admissions.  [Doc. 96-2].  Specifically, No. 92 of the Requests for Admissions states as follows: "Admit that Home Federal Bank of Tennessee's Board of Directors approves the opening of a new bank branch in a new market."  [Doc. 96-2 at 17].  Plaintiff responded: "HFTN admits that Home Federal Bank of Tennessee's Board of Directors has approved the opening of new bank branches.  HFTN can neither admit nor deny whether the Home Federal Bank of Tennessee's Board of Directors will approve the opening of new bank branches in the future."  [*Id.* at 17-18].

Plaintiff relies on Attorney Rice's Declaration [Doc. 40-1], which was filed in response to the original motion to amend the protective order.  Attorney Rice states that she joined Plaintiff's Board on March 21, 2019.  [*Id.* at ¶¶ 11 and 12].  She has represented Plaintiff in numerous litigated matters since 2004.  [*Id.* at ¶ 5].  In addition, she regularly responds to questions from various bank employees regarding subpoenas, levies and garnishments, powers of attorney, court orders, and similar documents presented to the bank.  [*Id.* at ¶ 6].  Attorney Rice states that her primary contact with Plaintiff has been Plaintiff's in-house counsel, with whom Attorney Rice works directly with in litigation matters.  [*Id.* at ¶ 7].  Attorney Rice states that other members of the firm, Egerton, McAfee, Armistead & Davis, P.C., assist Plaintiff in drafting certain loan documents and various trust documents for estate and trust proceedings.  [*Id.* at ¶ 9].  Attorney Rice states that as part of her representation of Plaintiff, she has never been involved in decisions with respect to Plaintiff's marketing, pricing, the negotiation of agreements (other than standard litigation-related settlement

11

agreements), or any other activity that could be classified as competitive decision making. [*Id.* at ¶ 8].

Attorney Rice states that Plaintiff has no patents, formulas, or technical secrets that it uses to compete with other banks. [*Id.* at ¶ 14]. Instead, Plaintiff's strategy for competing in the marketplace is to hire excellent personnel, run a high-quality financial institution, and provide excellent service. [*Id.*]. Attorney Rice states that Plaintiff employs a Director of Marketing whose job it is to make marketing decisions and to make recommendations on marketing strategy and marketing policy to Plaintiff's executive management team. [*Id.* at ¶ 16]. Attorney Rice states that the Director of Marketing rarely attends Board meetings. [*Id.* at ¶ 17]. Attorney Rice states that Plaintiff's operational decisions are not based upon the actions of other banks in the community, but instead, are guided by Plaintiff's corporate goals and external factors, such as federal reserve rates, as well as its core values and code of ethics. [*Id.* at ¶ 18].

With respect to the Board, Attorney Rice states that it generally reviews, at a high level, and where appropriate, approves, Plaintiff's matters of general governance, its financial performance, its compliance with its own policies and with applicable regulatory guidelines and requirements, internal operating policies and guidelines that have been adopted or are recommended for adoption by management, lending decisions of certain threshold levels which have been made by Plaintiff's management, and investment transactions made by Plaintiff's trust department. [*Id.* at ¶ 19]. Attorney Rice states that the Board has several standing committees and that she is a member of the Audit and Trust Committees, for the remainder of 2019, which are described as follows:

> The Audit Committee reviews the results of Plaintiff's auditing procedures and legal exposure, reviews policies and procedures related to regulatory compliance, and meets independently with the

12

Bank's auditor and its general counsel as needed to insure proper compliance with all audit and legal matters.

The Trust Committee receives reports on the trust and estate matters handled by the Bank's Trust Department. It directs and reviews the actions of officers, employees, and committees utilized by the Bank in the exercise of its fiduciary powers, and related matters, determines policies and approves investment and disposes of property held in a fiduciary capacity.

[*Id.* at ¶ 20].

Attorney Rice states that as a Board member, her contact with Plaintiff's operational managers is infrequent and most often through various reports made at Board or Board committee meetings. [*Id.* at ¶ 22]. She concludes, "As a member of the Board of directors of Plaintiff, I am obligated to recuse myself from discussions and decisions where I may have a conflict of interest, and I intend to meet that obligation fully." [*Id.* at ¶ 24].

Plaintiff argues that *U.S. Steel* rejects the per se rule that Defendant is advocating. Plaintiff states that the Court is required to consider whether Attorney Rice is involved in advising or participating in competitive decision making. Plaintiff further argues that Defendant has not satisfied its burden in showing that Attorney Rice is involved in competitive decision making. Plaintiff states that Defendant's documents are not properly designated as Highly Confidential Material.[5] Finally, Plaintiff argues that prejudice mitigates in favor of denying Defendant's Renewed Motion.

Defendant filed a Reply [Doc. 123], arguing that it properly designated certain information, such as bank exams, financial documents, strategic plans, ALCO (Asset Liability Committee) committee minutes, and marketing plans as Highly Confidential Material. Defendant asserts that

---

[5] Plaintiff's argument is the subject of a separate motion, Plaintiff's Motion to Compel Redesignation of Highly Confidential Materials and for Expedited Briefing [Doc. 136].

13

Plaintiff cannot avoid that its Board approves the opening of new branches in new markets and that an evidentiary hearing is warranted wherein Attorney Rice or one of Plaintiff's Board members testifies. Defendant argues that Plaintiff has not produced a case that holds that lead counsel, who is also on the Board, should be allowed to view documents that are marked "attorney-eyes' only." Finally, Defendant argues that Plaintiff would not suffer any financial hardship if required to obtain new counsel.

### B.      Defendant's Motion to Disqualify [Doc. 115]

Defendant requests that Attorney Rice be disqualified in this case pursuant to Tennessee Rules of Professional Conduct 1.7. Defendant frames the legal issue as follows: may an attorney who is bound by a protective order barring her from disclosing Highly Confidential documents to her client continue to represent the client while at the same time reviewing those Highly Confidential documents after she joins the client's Board of Directors? Defendant argues that Rule 1.7 prohibits Attorney Rice from representing Plaintiff because her representation involves a concurrent conflict of interest. Defendant argues that the conflict stems from Attorney Rice's responsibilities to a third person and/or Attorney Rice's personal interests—namely, her fiduciary duties as a member of Plaintiff's Board and/or her ethical obligations under the Agreed Protective Order not to disclose Defendant's Highly Confidential Material. Defendant argues that the exceptions in Rule 1.7(b) are not applicable.

Plaintiff argues [Doc. 128] that Defendant lacks standing to seek Attorney Rice's disqualification because Defendant is neither a current nor a former client of Attorney Rice. Plaintiff states that the Sixth Circuit, *Dana Corp. v. Blue Cross & Blue Shield*, 900 F.2d 882, 889 (6th Cir. 1990), requires a past attorney-client relationship between the moving party and the attorney it seeks to disqualify. Further, Plaintiff states that Attorney Rice's status as its attorney

14

and as a member of the Board does not create an ethical conflict under the Rules of Professional Conduct to justify her disqualification. In addition, Plaintiff states that there is nothing just or fair about the relief sought by Defendant and that the granting of Defendant's request will prejudice Plaintiff. Finally, Plaintiff argues that by failing to seek Attorney Rice's disqualification for seven months, Defendant has waived any conflict.

Defendant filed a Reply [Doc. 35], arguing that Plaintiff's reliance on *Dana Corp.* is misplaced. Defendant argues that in 2006, the Sixth Circuit held that the codified Rules of Professional Conduct now govern such inquiries. Defendant states that Rule 1.7 specifically applies to the personal interests of the lawyer, and therefore, an improper conflict exists. Defendant argues that it timely sought disqualification and that the potential harm and risk of inadvertent disclosure of Defendant's Highly Confidential Material greatly outweigh any potential prejudice to Plaintiff.

In support of its Reply, Defendant filed two new Declarations: (1) Christopher Sablich, and (2) Alex Cook. Christopher Sablich ("Sablich") is an independent consultant who was retained by Defendant to offer an opinion with respect to Plaintiff's contention that the Board does not engage in competitive decision-making. [Doc. 132-1 at 2]. Sablich states that he is a former National Bank Examiner and has served in this capacity for seventeen (17) years. [*Id.*]. Later, he became an attorney in the OCC's Central District Office and served in this role for seventeen (17) years. [*Id.*]. He states that in his career, he has examined more than twenty (20) banks as the Examiner-in-Charge and more than one hundred (100) banks as part of an examination team with the OCC. [*Id.* at 3].

Sablich states that pursuant to OCC Bulletin 2014-35 ("OCC Bulletin"), dated July 22, 2014, and titled, "Mutual Federal Savings Association: Characteristics of Supervisory

Considerations," "mutuals are governed by the same statutory requirements, rules, and regulations as shareholder-owned or stock FSA," subject to certain regulatory provisions. [*Id.* at 3].[6] According to Sablich, the OCC provides that "mutual boards of directors are required to exercise their fiduciary duties and provide appropriate oversight over management." [*Id.*] (citing the OCC Bulletin 2014-35).

Sablich opines that based on his knowledge and his experience, *The Director's Book* [Doc. 33-1] applies to Plaintiff and its Board of Directors. [*Id.*]. Sablich states that as noted in *The Director's Book*, the board of directors is responsible for the overall direction and oversight of the bank, including reviewing and approving the bank's strategic or business plans. [*Id.* at ¶ 9]. Sablich submits that a bank's strategic planning process involves, among other things, an evaluation and analysis of the bank's external environment, including the competitive environment. [*Id.*]. Sablich opines as follows:

> It is my opinion that some aspect of a bank's competitive environment is a factor that is, or should be, considered in many board decisions beyond the strategic planning process, including, for example, the approval of specific expansion plans (e.g., opening or closing of branches or loan production offices, mergers, and acquisitions, establishment of operating subsidiaries, and new products and services); approval of loan, investment, liquidity and asset/liability policies; approval of staffing plans and compensation; and approval of marketing campaigns.

[*Id.* at 3-4]. Sablich continues that according to *The Director's Book*, a director's duties include, among other things, "exercising independent judgment," "providing credible challenge to management," and "staying informed on the bank's operating and business environment." [*Id.* at 4]. Sablich states that in order to understand and challenge management recommendations and

---

[6] The OCC Bulletin is attached to Sablich's Declaration. [Doc. 132-1 at 10-15].

advice, the directors must have some understanding of the competitive environment in which the bank is operating. [*Id.*]. He opines:

> In my 34 years of experience, it is my opinion that the OCC expects that directors will exercise their independent judgment in evaluating management's recommendations and advice rather than rubberstamp such recommendations.
>
> It is my opinion that an attorney/director for a competing bank having access to four years of Defendant's regulatory reports of examination ("ROEs"), CAMELS ratings, strategic plans, and marketing plans would be [sic] result in a competitive advantage for that competing bank.

[*Id.* at 4].

As mentioned above, Defendant has also filed the Declaration of Alex Cook [Doc. 132-2], Defendant's President and CEO. [*Id.* at 1]. Cook states that in his capacity as a member of Defendant's Board, he participates and engages in competitive decision-making. [*Id.* at ¶ 4]. Cook also explains why Attorney Rice's access to Defendant's Highly Confidential Material would be harmful to Defendant. [*Id.* at 3-4].

## III.   ANALYSIS

The Court will first address Defendant's Motion for Evidentiary Hearing [Doc. 126] and then turn to Defendant's Motion for Leave to File Supplemental Memorandum in Support of Emergency Renewed Motion to Amend Agreed Protective Order and Motion to Disqualify [Doc. 178]. Lastly, the Court will turn to the remaining Motions [Docs. 96, 115].

### A.   Defendant's Motion for Evidentiary Hearing [Doc. 126]

As mentioned above, on November 12, 2019, the Court set a hearing on Defendant's Renewed Motion and Motion to Disqualify for November 26, 2019.[7] The instant Motion was filed

---

[7] The Court set the hearing as soon as possible in light of the issues stalling discovery and in light of Defendant's Motion for Expedited Briefing Scheduling and Hearing [Doc. 97].

17

on November 20, 2019, and therefore, was not ripe, *see* E.D. Tenn. L.R. 7.1, until after the November 26 hearing. During the November 26 proceeding, the Court generally discussed Defendant's request for an evidentiary hearing with the parties. Defendant stated that its Motion is related to Seblach's Declaration, which Defendant attached to its reply brief in support of its Motion to Disqualify Counsel. Defendant stated that the Court will be able to hear the witnesses beyond the declarations that were filed, including Attorney Rice. Plaintiff responded that Defendant had already deposed Sharp and that they had filed two new declarations. Plaintiff maintained that Defendant has had months to litigate this issue.

In Defendant's Motion, it requests an evidentiary hearing so that the Court will hear live testimony from a member of Plaintiff's Board and any other witnesses that the Court deems necessary. Defendant states that an evidentiary hearing is necessary given the conflicting statements in Rice's Declaration and the deposition testimony of Sharp.

Plaintiff responds [Doc. 133] that the Motion is untimely, and Defendant has had ample time and opportunity to gather evidence to support its motions. Further, Plaintiff states that even if Defendant's Motion is not untimely, it is without merit. Plaintiff argues that the Court has sworn declarations, deposition testimony, discovery responses, and other documentation to adjudicate this issue.

Defendant replies [Doc. 141], stating that Plaintiff created this situation by electing Attorney Rice to its Board. Defendant states that there is no timeline to request an evidentiary hearing. Defendant would like to present the live testimony of Christopher Sablich, the former OCC examiner that Defendant retained, so that the Court could hear that Plaintiff's contentions that the Board does not make competitive decisions go against all OCC's directions and guidance.

18

In addition, Defendant states that live testimony from its President, Alex Cook, will show the serious harm to Defendant in the event a competitor has access to its Highly Confidential Material.

As an initial matter, the Court notes that Defendant filed its original motion raising Attorney Rice's issues with participating in this lawsuit in May 2019. Defendant's request for an evidentiary hearing was not filed until November 20, 2019, three business days before the agreed-upon date for the motion hearing and approximately six months after the issue first arose. Further, the Sixth Circuit has held that an evidentiary hearing is not required with respect to motions to disqualify counsel "if the factual inquiry is conducted in a matter that will allow appellate reviews." *Gen. Mill Supply Co. v. SCA Servs., Inc.,* 697 F.2d 704, 710 (6th Cir. 1982).

Given the record before it, the Court finds an evidentiary hearing unnecessary. *Lani on behalf of Schiller Kessler & Gomez, PLLC v. Schiller Kessler & Gomez, PLC*, No. 3:16-CV-00018-CRS, 2017 WL 938327, at *5 (W.D. Ky. Mar. 9, 2017) (denying request for an evidentiary hearing). The Court has Attorney Rice's Declaration, Plaintiff's discovery responses, the deposition of Sharp, Defendant's President and CEO's Declaration, and Sablich's Declaration. Defendant does not sufficiently explain why live testimony is necessary, especially given that Defendant has had over five months to submit information to the Court and has submitted information and declarations to the Court. Accordingly, the Court **RECOMMENDS** that Defendant's request for an evidentiary hearing [**Doc. 126**] be denied.

### B. Defendant's Motion for Leave to File Supplemental Memorandum in Support of Emergency Renewed Motion to Amend Agreed Protective Order and Motion to Disqualify [Doc. 178]

Defendant states that it filed its Renewed Motion and Motion to Disqualify, which are premised on the same constellation of facts (i.e., Attorney Rice's role as a member of Plaintiff's Board). Defendant states that during Sharp's deposition, Defendant inquired as to whether

19

Attorney Rice would have any role in approving new branches. Sharp testified in the affirmative but stated that Plaintiff has not had a new branch in a long time. Sharp stated that the decision to open a new branch would become before the Board. Defendant states that Plaintiff did not note any new branch openings in its responses to written discovery.

Defendant states that it recently discovered that Plaintiff opened a new office, denominated the "West Knoxville Mortgage Office" on Plaintiff's website. Defendant states that this is displayed as a separate office from its West Knoxville Full-Service Branch location and is operating under the trade name "HF Mortgage" Office. Defendant states that it is investigating the circumstances surrounding the opening of this office, but the property appears to have been purchased in November 2018 and renovated in March 2019. Defendant states that the existence of this new location would have been known to Sharp at the time of his deposition, as we well Attorney Rice. Defendant requests fourteen (14) days to file a supplemental memorandum.

Plaintiff objects [Doc. 179], stating that the proposed supplemental brief will be Defendant's fifteenth filing related to the issue of Attorney Rice's participation. Plaintiff argues that Defendant's antics have resulted in litigation within litigation and have significantly delayed the advancement of this case. In addition, Plaintiff argues that Defendant's supplemental brief would be futile because it is premised on false and unsupported conjecture. Plaintiff states that defense counsel never asked Plaintiff's counsel about the circumstances surrounding the mortgage office.

Plaintiff explains that in 2018, its largest tenant, which occupies the building where its Cedar Bluff Branch is located, informed Plaintiff that it needed more space in order to continue its lease. Plaintiff states that the property/building next door to Plaintiff's Cedar Bluff Branch on Parkwest Boulevard ("Office Building") was for sale. Plaintiff also decided it could utilize some

20

of the Office Building, so it purchased the Office Building. Plaintiff states that in the summer 2019, Plaintiff relocated its mortgage office from Downtown West Boulevard to the Office Building on Parkwest Boulevard. Plaintiff states that neither the decision to purchase the Office Building from which the mortgage office now operates, nor the decision to relocate the mortgage office to that Office Building was presented to Plaintiff's Board for approval at any time. Plaintiff argues that Defendant's attempt to classify the relocation of an existing mortgage office as the opening of a new limited branch under Tennessee law is not only uninformed but also disingenuous. Finally, Plaintiff argues that if Defendant is permitted to continue its pattern of delay and avoidance, Plaintiff will be prejudiced.

Defendant argues that Plaintiff's office is at a new location, operating under a new name similar to Defendant's name. Defendant states that the use of the name "HFB Mortgage" is a central dispute in this case and that Plaintiff's decision to open a new mortgage office 2.2 miles from Defendant's location is relevant to multiple discovery requests. Defendant argues that no information was produced in discovery. Finally, Defendant argues that Plaintiff's response notably contains no indication whether the relocation was contained in the corporate plan that Sharp testified about, whether the Board may have approved the purchase of the Office Building, or whether the Board had knowledge of the new location, regardless if formal approval of Plaintiff's Board was obtained. Defendant states that Plaintiff's Response contains no sworn declaration from a member of Plaintiff's Board.

The Court has considered Defendant's request and finds it to be not well taken. The Court cannot continue to allow additional briefs as it ultimately delays final adjudication of these issues. As mentioned above, the parties have litigated this issue, which does not relate to the merits of this case, for over six months. Further, the instant Motion seeks to file a brief based on speculation

21

that Plaintiff opened a new branch, as opposed to simply moving offices. Accordingly, the Court finds Defendant's request [**Doc. 178**] not well taken, and the undersigned **RECOMMENDS** that it be **DENIED**.

### C.     Renewed Motion [Doc. 96]

As mentioned above, Defendant's Renewed Motion argues that Attorney Rice, by virtue of her position on Plaintiff's Board, because she has a fiduciary obligation to exercise full decision-making authority on behalf of Plaintiff, should be prohibited from reviewing Defendant's Highly Confidential Material. In addition, Defendant argues that Attorney Rice engages in competitive decision making. In response, Plaintiff argues that Defendant's first argument amounts to a per se rule, which *U.S. Steel* rejected. Further, Plaintiff denies that Attorney Rice engages in competitive decision making.

"A party has a strong interest in choosing counsel to represent it, and that counsel generally has a right to access all materials in the case including those produced confidentially during discovery." *Evertz Microsystems Ltd. v. Lawo Inc.*, No. CV 19-302-MN-JLH, 2019 WL 5864173, at *2 (D. Del. Nov. 8, 2019). Courts have explained, however, "This general rule is not without limitations, and counsel's access to confidential information may be denied or limited when there is a high risk of inadvertent disclosure." *Id.* "Determining if there is a high risk of inadvertent disclosure is fact-intensive inquiry that must be conducted on a counsel-by-counsel basis." *Id.* When balancing the risk of inadvertent disclosure, courts should consider whether the individual "would be virtually unable to compartmentalize the information and not use the information to seek to gain an unfair competitive advantage. Courts have used the 'competitive decision-making' test when balancing the risks and a person's inability to compartmentalize competition information." *Suture Exp., Inc. v. Cardinal Health, 200, LLC*, No. 12-2760-RDR, 2013 WL

6909158, at *7 (D. Kan. Dec. 31, 2013). As the Federal Circuit announced in *U.S. Steel*, counsel engaged in competitive decision making should be restricted from access. 730 F.2d at 1468.

The Court has previously discussed the Federal Circuit's decision in *U.S. Steel*. *See* [Doc. 60]. Specifically, in *U.S. Steel*, the Court of International Trade ("CIT") denied plaintiff's corporate in-house counsel access to confidential information, reasoning that there was "a great likelihood of inadvertent disclosure by lawyers who are employees committed to remain in the environment of a single company." *Id.* at 1467-68. The Federal Circuit reversed CIT's decision, explaining that "[d]enial or grant of access, however, cannot rest on a general assumption that one group of lawyers are more likely or less likely inadvertently to breach their duty under a protective order." *Id.* at 1468. The Court reasoned:

> Indeed, it is common knowledge that some retained counsel enjoy long and intimate relationships and activities with one or more clients, activities on occasion including retained counsel's service on a corporate board of directors. Exchange of employees between a client and a retained law firm is not uncommon. Thus the factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be inhouse or retained, must govern any concern for inadvertent or accidental disclosure.

*Id.* The Court noted that "[i]n a particular case, e.g., where in-house counsel are involved in competitive decision making, it may well be that a party seeking access should be forced to retain outside counsel or be denied the access recognized as needed." *Id.* at 1468. The Court explained that the phrase "competitive decision making" appears "serviceable as shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *Id.* at 1468 n. 3. Thus, the Court concluded, "[A] denial of access sought by in-house counsel on the sole ground of their status as

in-house counsel is error." *Id.* at 1469; *see also Matsushita Elec. Indus. Co. v. United States*, 929 F.2d 1577, 1580 (Fed. Cir. 1991) ("It is a natural extension of the rule enunciated by this court in *U.S. Steel* that a denial of access sought by in-house counsel on the sole ground of status as a corporate officer is error.").

Thus, the Court in *U.S. Steel* rejected the per se rule that Defendant is now advocating. While the Sixth Circuit has not considered the applicability of *U.S. Steel*, the Court agrees with the approach in *U.S. Steel* and will not simply look to Attorney Rice's title, but instead, the Court will review the facts and determine whether Attorney Rice engages in competitive decision making as part of Plaintiff's Board. *See In re Sibia*, 132 F.3d 50, 1997 WL 688174, at 3 (Fed. Cir. Oct. 22, 1997) ("The facts, not the category must inform the result. Our holding in *U.S. Steel* dictates that each case must be decided based on the specific facts involved therein.").

Accordingly, the question before the Court is whether Attorney Rice engages in activities that are considered "competitive decision making." Since the decision in *U.S. Steel*, courts have expounded on what activities constitute "competitive decision making." For instance, in *Matsushita*, the court stated that the standard for competitive decision making "is not 'regular contact' with other corporate officials who make 'policy,' or even competitive decisions, but 'advice and participation in 'competitive decision making.'" 929 F.2d at 1580.

In the present matter, Defendant relies on Sharp's testimony that the Board would vote on whether to open a new branch. In addition, Defendant relies on Plaintiff's response to No. 92 of the Requests for Admissions that states as follows: "Admit that Home Federal Bank of Tennessee's Board of Directors approves the opening of a new bank branch in a new market." [Doc. 96-2 at 17]. Plaintiff responded: "HFTN admits that Home Federal Bank of Tennessee's Board of Directors has approved the opening of new bank branches. HFTN can neither admit nor deny

24

whether the Home Federal Bank of Tennessee's Board of Directors will approve the opening of new bank branches in the future." [Doc. 96-2 at 17-18].

The Court does find that the decision to open a new branch is a type of activity that involves competitive decision making. The problem for Defendant, however, is that there is no evidence that Attorney Rice, while on the Board, has approved or will approve the opening of a new branch. As Defendant points out, the Board has previously approved new branches, but there is no evidence that the Board has considered such a decision within the past year since Attorney Rice's tenure on the Board or that the Board intends to do so while this litigation is pending.

Further, during oral argument, Defendant focused on Sharp's testimony that the Board approves the corporate plan. Specifically, Sharp testified that Plaintiff's corporate plan is based on financial objectives and includes estimates on several items, including bond portfolios, deposit liabilities, income, and expenses. [Doc. 96-1 at 5]. The Court finds such testimony does not establish Attorney Rice is involved in competitive decision making. Instead, it appears that the corporate plan simply contains Plaintiff's financial objectives based on Plaintiff's own estimated profits and expenses. Despite deposing a member of Plaintiff's Board, Defendant has not put forward any other activities that Attorney Rice engages in that would amount to competitive decision making.

In summary, Defendant has not presented evidence showing that Attorney Rice is involved in competitive decision making under *U.S. Steel*. After balancing the risk of inadvertent disclosure against the risk of prejudice to Plaintiff's ability to prosecute this action, the Court finds the risk weighs in Plaintiff's favor and that Attorney Rice is able to compartmentalize any competitive information. The evidence that has been presented shows that Plaintiff's Board operates somewhat uniquely and that all competitive decisions rest with management. This fact makes the cases that

25

Defendant relies on, *Meridian Enter. Corp. v. Bank of America*, No. 4:06CV0117, 2008 WL 474326 (E.D. Mo. Feb. 15, 2008) and *Norbrook Labs. Ltd., v. G.C. Hanford Mfg. Co.*, No. 5:03cv165, 20013 WL 1966214 (N.D. N.Y. Apr. 24, 2003), distinguishable from the present matter. Accordingly, the Court finds Defendant's request [**Doc. 26**] not well taken, and the undersigned **RECOMMENDS** that it be **DENIED**.

### D.    Motion to Disqualify Counsel [Doc. 115]

As mentioned above, Defendant requests that Attorney Rice be disqualified in this case pursuant to Tennessee Rule of Professional Conduct 1.7. Defendant argues that Rule 1.7 prohibits Attorney Rice from representing Plaintiff because her representation involves a concurrent conflict of interest—namely, her fiduciary duties as a member of Plaintiff's Board and/or her ethical obligations under the Agreed Protective Order not to disclose Defendant's Highly Confidential Material.

When confronted with a motion to disqualify, "courts must be sensitive to the competing public interests of requiring professional conduct by an attorney and of permitting a party to retain the counsel of his choice." *Reed Elsevier, Inc. v. Thelaw.Net Corp.*, 197 F. Supp. 2d 1025, 1027 (S.D. Ohio 2002) (quoting *Hamrick v. Union Township,* 81 F. Supp. 2d 876, 879 (S.D. Ohio 2000)); *see also Cavender v. U.S. Xpress Enters., Inc.*, 191 F. Supp. 2d 962, 964 (E.D. Tenn. 2002) ("motions to disqualify in a lawsuit are very sensitive and require the Court to exercise judgment with an eye toward upholding the highest ethical standards of the profession," while "protecting the interest of the litigants in being represented by the attorney of their choosing") (citing *Bartech Indus. v. Int'l Baking Co.*, 910 F. Supp. 388, 392 (E.D. Tenn. 1996)) (other citations omitted). To prevail on a motion to disqualify, the movant bears "the burden of proving that opposing counsel should be disqualified." *McKinney v. McMeans*, 147 F. Supp. 2d 898, 900 (W.D. Tenn. 2001)

(citing *Bartech Indus.*, 910 F. Supp. at 392).

The Court's authority to disqualify attorneys based upon a professional conflict is derived from two sources. First, pursuant to the Court's Local Rules, attorneys who appear in this Court are governed by the Tennessee Rules of Professional Conduct. E.D. Tenn. L.R. 83.6. "Second, since motions to disqualify counsel affect substantive rights of the parties, such motions are decided by applying standards developed under federal law." *Cavender*, 191 F. Supp. 2d at 965-66 (citing *Bartech Indus.*, 910 F. Supp. at 392).

As mentioned above, Defendant argues that Tennessee Rule of Professional Conduct 1.7(a)(2) disqualifies Attorney Rice from representing Plaintiff in this case. Specifically, Rule 1.7 provides as follows:

> Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Defendant also points to Comment 34 of Rule 1.7, which states as follows:

> A lawyer for a corporation or other organization who is also a member of its board of directors should determine whether the responsibilities of the two roles may conflict. The lawyer may be called on to advise the corporation in matters involving actions of the directors. Consideration should be given to the frequency with which such situations may arise, the potential intensity of the conflict, the effect of the lawyer's resignation from the board and the possibility of the corporation's obtaining legal advice from another lawyer in such situations. If there is material risk that the dual role will compromise the lawyer's independence of professional judgment, the lawyer should not serve as a director or should cease to act as the corporation's lawyer when conflicts of interest arise. The lawyer should advise the other members of the board that in some circumstances matters discussed at board meetings while the lawyer is present in the capacity of director might

27

not be protected by the attorney-client privilege and that conflict of interest considerations might require the lawyer's recusal as a director or might require the lawyer and the lawyer's firm to decline representation of the corporation in a matter.

Tenn. R. Prof'l Conduct 1.7, Comment 34.

Before turning to the merits of Defendant's argument, the Court must address whether Defendant has standing to raise such an argument. Plaintiff states that Defendant lacks standing because the Sixth Circuit requires a past attorney-client relationship between the party seeking disqualification and the attorney it seeks to disqualify, citing *Dana Corp. v. Blue Cross & Blue Shield*, 900 F.2d 882 (6th Cir. 1990). Defendant responds that Plaintiff's reliance on *Dana Corp.*, is misplaced because courts have adopted the Professional Rules of Conduct.

In *Dana Corp.*, the Sixth Circuit considered the district court's decision not to disqualify a law firm from representing plaintiff. *Id.* at 889. In that case, defendant argued that the court should have disqualified the law firm retained by plaintiff because the law firm previously represented its national organization in a trademark suit. *Id.* The Sixth Circuit disagreed, explaining as follows:

> A three-part test for disqualification exists: (1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of those relationships was/is substantially related; and (3) the attorney acquired confidential information from the party seeking disqualification.

*Id.* The Sixth Circuit reasoned that there was not a past attorney-client relationship and the lawsuits were not "superficially related," let alone substantially related. *Id.*

Later, the Sixth Circuit stated, in determining whether a law firm was disqualified in an appeal, as follows:

> Previously, the ethics rules for attorneys practicing in our court were largely governed by our common-law precedent. *See, e.g., Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222 (6th Cir. 1988). However, with the wide-spread acceptance of the American Bar

28

Association's Model Rules of Professional Conduct, we now look to the codified Rules of Professional Conduct for guidance. *See, e.g., Duggins v. Steak 'N Shake, Inc.,* 195 F.3d 828, 835 (6th Cir. 1999) (referring to and following the ABA's Model Rules of Professional Conduct and Model Code of Professional Responsibility). We conclude that applying these accepted rules will lead to greater uniformity and predictability with regard to the ethical code of conduct that we demand from the attorneys who practice before us.

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Alticor, Inc.,* 466 F.3d 456, 457–58 (6th Cir. 2006), *order vacated on reh'g sub nom. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Alticor, Inc.*, 472 F.3d 436 (6th Cir. 2007).

As Defendant notes in its brief, some courts have held, "Since the promulgation of the [Rules of Professional Conduct], the federal courts in Tennessee no longer apply the *Dana* test in deciding whether a conflict of interest warrants attorney disqualification." *Harbin Enterprises Gen. P'ship v. Ingram Micro Inc.*, No. 05-2942 MA/V, 2007 WL 9710345, at *5 (W.D. Tenn. Aug. 15, 2007); *see also Khan v. Cellco P'ship*, No. 1:10-CV-118, 2011 WL 5042071, at *2 (S.D. Ohio Sept. 8, 2011) (declining to apply the three-factor test in *Dana* stating that the "Sixth Circuit now relies primarily on the codified Rules of Professional Conduct in determining questions of lawyer disqualification in a given case"), *report and recommendation adopted sub nom. Kahn v. Cellco P'ship*, No. C-1-10-118, 2011 WL 5037225 (S.D. Ohio Oct. 24, 2011).

Subsequently, in 2013, the Sixth Circuit addressed another disqualification issue in *Bowers v. Ophthalmology Grp.*, 733 F.3d 647, 654 (6th Cir. 2013). In *Bowers*, the plaintiff alleged that defendant's counsel must be disqualified because counsel previously represented plaintiff in two matters that were substantially related to the instant case. *Id.* at 650-51. The Sixth Circuit utilized the three-factor test announced in *Dana Corp,* explaining:

Our decisions have not made clear how the *Dana* analysis operates in conjunction with this court's rule that attorneys are "subject to the

29

rules of professional conduct or other equivalent rules of the state where the attorney's principal office is located." 6th Cir. R. 46(b); *compare Dana*, 900 F.2d 882 (involving federal and state-law claims), *with Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Alticor, Inc.*, 472 F.3d 436 (6th Cir. 2007) (applying the Michigan Rules of Professional Conduct to disqualify an attorney on appeal).

*Id.* at 651. The Sixth Circuit concluded, "Regardless, the effect of using our *Dana* analysis is minimal at best because the relevant Kentucky Rule [1.9] is essentially the same." *Id.*

While the Rules of Professional Conduct govern, the Sixth Circuit's decision in *Dana Corp.* is relevant and helpful in analyzing whether attorneys should be disqualified due to their previous professional relationships.[8] Here, however, Defendant has raised a different type of conflict of interest pursuant to Rule 1.7. Attorney Rice's alleged conflict does not stem from a previous relationship, but instead, from her membership on Plaintiff's Board, her role as Plaintiff's lead counsel, and her review of Defendant's Highly Confidential Material.

In any event, however, the Court finds Defendant's Motion not well taken. Specifically, the Court has reviewed Rule 1.7 and finds Defendant lacks standing to challenge Attorney Rice's representation of Plaintiff. Several courts, within this Circuit have noted, "Generally, 'courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification.'" *State Farm Mut. Auto. Ins. Co. v. Elite Health Centers, Inc.*, No. 2:16-CV-

---

[8] It appears to the undersigned that the three-part test for disqualification (i.e., past-attorney client relationship, subject matter is/was related, and attorney acquired confidential information from the movant) fits neatly in factual scenarios where one party alleges that the other party's counsel previously represented him/her. In fact, in *Dana Corp.*, and in other decisions relying on *Dana Corp.*, courts addressed whether attorneys or law firms could represent a party when they had represented the other party in a previous case. *See SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Oh. 2002) (whether the firm the lawyer and client left behind should be disqualified when that firm is now in an adverse position to the former lawyer and the essentially former client); *Kirsch v. Dean*, No. 3:16-CV-00299-CRS, 2016 WL 7177765, at *3 (W.D. Ky. Dec. 7, 2016) (addressing whether an attorney should be disqualified for his or her former representation of a client).

13040, 2019 WL 2576360, at *4 (E.D. Mich. June 24, 2019), *objections overruled,* No. 16-13040, 2019 WL 4017161 (E.D. Mich. Aug. 26, 2019) (quoting *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 86-88 (5th Cir. 1976)); *see also Winchester v. Education Mgmt. Corp.*, No. 5:10-CV-00012-TBR, 2010 WL 2521465, at *2 ("Here, the Court concludes Plaintiff as a non-client litigant does not have standing to disqualify opposing counsel."); s*ee also Frey v. Prior,* Nos. 91-3567, 91-3725, 1991 WL 253557, at *1 (6th Cir. Nov. 27, 1991) (finding that plaintiff lacks standing to assert a claim of interest because no attorney-client relationship existed between him and the law firm or the attorney) (citing *In re Yarn*, 530 F.2d at 89-90); *Caldwell v. Compass Entm't Grp. LLC*, No. 6:14-CV-1701-ORL-41, 2014 WL 7070002, at *3 (M.D. Fla. Dec. 15, 2014) ("Because litigants ordinarily do not go out of their way to protect the interests of their opponents, courts generally take a skeptical view of such motions."). [9]

---

[9] In *State Farm*, the court noted that "a minority of courts permit a non-party to raise opposing counsel's conflict." 2019 WL 2576360, at *2 (citations omitted). The court also explained, however, that the Sixth Circuit has held "plaintiff's standing to assert opposing counsel's alleged conflict of interest is questionable at best." *Id*. (quoting *Willis v. First Bank Nat'l Ass'n*, Nos. 89-3834, 89-3838, 1990 WL 155366, at *1 (6th Cir. Oct. 15, 1990)). The court in *Winchester* explained, "A minority of courts have allowed a non-client to bring a motion to disqualify relying on the court's 'well recognized power to control the conduct of the attorneys practicing before it.'" 2010 WL 2521465, at *2 (citing *Colyer v. Smith,* 50 F. Supp. 2d 966, 969 (C.D. Cal. 1999)). Even those courts, however, hold that the "non-client litigant 'must establish a personal stake in the motion to disqualify sufficient to satisfy the 'irreducible constitutional minimum' of Article III." *Id.* (quoting *Colyer*, 50 F. Supp. 2d at 971). Arguably, Defendant's personal stake is that Attorney Rice as lead counsel and as a Board member has access to Defendant's Highly Confidential Material. "Motions to disqualify counsel are highly disfavored and 'disqualification is considered a drastic measure which courts should hesitate to impose except when absolutely necessary.'" *State Farm*, 2019 WL 2576360, at *1 (quoting *Glenn v. Nasscond, Inc.*, No. 15-10270, 2016 WL 409409, at *2 (E.D. Mich. Feb. 3, 2016)) (other quotation omitted). Therefore, given that disqualification is such a drastic step and used only when absolutely necessary, the more appropriate remedy, if one were warranted, would be to amend the Agreed Protective Order and not to disqualify Attorney Rice from this case.

31

Even if Defendant did have standing to pursue this issue, the Court does not find that Attorney Rice's membership on Plaintiff's Board disqualifies her from representing Plaintiff in this case. As an initial matter, as stated above, *see supra* note 9, the Court finds that the more appropriate remedy, if one were warranted, would be to amend the Agreed Protective Order and not disqualify Attorney Rice. *See State Farm*, 2019 WL 2576360, at *1 (E.D. Mich. June 24, 2019) (explaining that "[m]otions to disqualify counsel are highly disfavored and 'disqualification is considered a drastic measure which courts should hesitate to impose except when absolutely necessary'") (quoting *Glenn*, 2016 WL 409409 at *2). Further, Rule 1.7 states that a concurrent conflict of interest exists if there is a significant risk that the representation will be materially limited by other responsibilities. Tenn. R. Prof'l Conduct 1.7(a)(2). The Court finds that Defendant has not sufficiently shown how Attorney Rice's representation of Plaintiff has been materially limited by her position on the Board.

Specifically, in support of its argument, in its reply brief, Defendant submitted the Declarations of Christopher Sablich and Alex Cook. The Court has reviewed these Declarations but finds that they do not support disqualifying Attorney Rice from this case. These Declarations do not show that Plaintiff complies with the OCC Director's Book, nor do they establish that Attorney Rice's representation of Plaintiff in this case will be materially limited by her responsibilities to the Board or to Defendant under the Agreed Protective Order. Further, Sablich states in paragraph 11, "It is my opinion that some aspect of a bank's competitive environment is a factor that is, *or should be*, considered in many board decisions beyond the strategic planning process." [Doc. 132-1 at ¶ 11] (Emphasis added). Again, there is no evidence that Attorney Rice actually does advise or participate in competitive decision making. Accordingly, the Court finds

that Defendant has not sufficiently shown that Attorney Rice has a concurrent conflict that would preclude her from representing Plaintiff in this matter.

## IV.     CONCLUSION

Accordingly, for the reasons as fully explained above, the Court **RECOMMENDS**[10] that Defendant's Emergency Renewed Motion to Amend Agreed Protective Order [**Doc. 96**]; Defendant's Motion to Disqualify [**Doc. 115**]; Defendant's Motion for Evidentiary Hearing [**Doc. 126**]; and Defendant's Motion for Leave to File Supplemental Memorandum [**Doc. 178**] be **DENIED**.

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[10] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

33